UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Marina A. Carter,

       Plaintiff,

       v.                              Civil Action No. 2:14-cv-46-wks-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.

## REPORT AND RECOMMENDATION
(Docs. 5, 7)

      Plaintiff Marina Carter brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying her application for disability insurance

benefits ("DIB"). Her alleged disability onset date is June 30, 2005, which is also the

date she was last insured for DIB.[1] Pending before the Court are Carter's motion to

reverse the Commissioner's decision (Doc. 5), and the Commissioner's motion to affirm

the same (Doc. 7). For the reasons stated below, I recommend that Carter's motion be

DENIED, and the Commissioner's motion be GRANTED.

---

[1] A DIB applicant has the burden of proving she became disabled "on or before h[er] date last insured." *Allord v. Astrue*, 631 F.3d 411, 416 (7th Cir. 2011) (citing 42 U.S.C. § 423(a)(1)(A), (c)(1)); *see* 20 C.F.R. §§ 404.130, 404.131, 404.315(a)(1). Given that Carter's alleged disability onset date is *the same date as* her date last insured, her alleged period of disability spans only one day; thus she has the difficult burden of proving she retained the capacity to work up to that day, but then lost it during the next 24 hours. *Harris v. Astrue*, No. 11 C 3039, 2013 WL 3895229, at *9 (N.D. Ill. July 29, 2013) (stating that the claimant "really boxed herself into a corner by claiming . . . an onset date . . . that was one day before her insured status expired"). Oddly, neither party (nor the ALJ) straightforwardly addresses this significant weakness in Carter's claim.

**Background**

Carter was 46 years old on her alleged disability onset date of June 30, 2005.  (AR 106.)  She is a high-school graduate and completed three years of college.  (AR 232, 410.)  From approximately 1996 through 2000, she worked as an administrative assistant at a water-testing business.  (AR 43, 222, 232, 275.)  She has also owned and operated a clothing store.  (AR 43.)  Since around 2000, Carter has periodically self-employed as a musician (pianist) hired to play events.  (*See* AR 42, 48, 244, 248.)  In 2011, she described this employment in a letter to "Disability Council": "I am a respected and professional musician playing only in high-end venues and with high-end clients . . . ."  (AR 247.)  She also helps her husband with bookkeeping associated with his small contracting business.  (AR 264.)

Carter is divorced and remarried, and has an adult stepdaughter.  (AR 41, 53, 264.)  In October 1995, she had a sudden return of memories of being sexually abused by family members as a child.  (AR 247, 347, 407, 412, 532–33.)  The surfacing of these repressed memories caused her extreme emotional and physical distress.  (AR 247.)  Soon after the memories emerged, Carter moved from New York to Vermont, divorced her husband, and separated from her church and band which had been significant parts of her life.  (*Id.*; *see also* AR 347.)  In February 1996, she began treating with psychologist Dr. Johnel Bushell, who diagnosed posttraumatic stress disorder ("PTSD").  (AR 248, 300.)  In August 2000, she began taking Imitrex for severe migraine headaches.  (AR 376.)  In the fall of 2000, after treating Carter for over two years, Carter's primary care

physician, Dr. Avery Wood, diagnosed her with fibromyalgia, along with PTSD and anxiety.  (AR 373.)

By around 2001, Carter's PTSD and other symptoms had decreased significantly; and she stopped treating with Dr. Bushell by 2003.  (AR 58–59, 301, 347, 482, 484.)  In an April 2001 treatment note, Dr. Bushell recorded that Carter's energy level "ha[d] been going up consistently"; she was exercising regularly and working a "gig" on Sundays; and her anxiety was decreasing.  (AR 484.)  In a March 2002 treatment note, Dr. Bushell stated that Carter was "emotionally OK," did not feel depressed anymore, and was dealing with her fibromyalgia better.  (AR 482.)  In January 2003, while seeing Dr. Wood about a possible mercury exposure, Carter reported that she was using her medications infrequently, feeling better with regular exercise, and working at Stratton playing the piano.  (AR 360.)  In March 2004, Carter told Dr. Wood that her migraines were improving and that, "overall" her fibromyalgia was "doing well," although it took "a lot of effort on her part."  (AR 353.)  As of May 2005, Carter was having only one or two migraines per month and Imitrex was working well to treat them.  (AR 342.)  Dr. Wood recorded that Carter's chronic fatigue/fibromyalgia had improved (*id.*), and that overall, Carter's pain level was "tolerable" (AR 343).  Carter testified at the July 2012 administrative hearing that, on a typical day in 2005, she would take her stepdaughter to school, try to work out "a little bit," do some very light cleaning up around the house, and rest on the couch or in bed.  (AR 53.)

In June 2005, Carter was seen in the emergency department of Southwestern Vermont Medical Center after a prolonged migraine headache and associated symptoms.

(AR 438–39.)  Her prescribed medications at the time included Xanax, Vicodin, Imitrex, and cyclobenzaprine, all prescribed by Dr. Wood.  (AR 342.)  In February 2007, Carter was again seen in the emergency department for another severe migraine headache.  (AR 441–42.)  Upon discharge later that day, she was "feeling much better" and her headache was gone.  (AR 442.)

In March 2008, Carter resumed therapy with Dr. Bushell to address her social anxiety symptoms.  (AR 301, 480.)  Dr. Bushell's treatment notes indicate that Carter was working as a pianist at Equinox Resorts and in a jazz trio for corporate events.  (AR 480.)  In May 2008, Dr. Wood stated in a treatment note that Carter was "[d]oing well with fibro[myalgia] and migraines," although she was sometimes using alcohol to treat her anxiety.  (AR 331.)  In November 2008, despite recording that Carter had been "feeling poorly" for the prior five months, Dr. Wood stated that "generally" Carter's life was "going well" and she was "keeping stress [levels] down."  (AR 327.)  Carter continued to treat with Dr. Wood through at least June 2012.  (*See* AR 454–65, 469–70, 548–51.)

In early 2010, Carter underwent a routine outpatient surgical procedure on her face.  (AR 388.)  The procedure triggered an acute panic attack that precipitated a significant increase in her PTSD, anxiety, fibromyalgia, and migraine symptoms.  (AR 393.)  In April 2010, Carter began psychotherapy with Lodi Vadakin, MA, LADC, to try to stabilize these symptoms.  (*Id.*; AR 409–12.)  Carter continued to see Vadakin through at least June 2012.  (*See* AR 541–47.)

In January 2011, Carter filed an application for DIB, alleging that, starting on June 30, 2005, she has been unable to work due to fibromyalgia, severe migraine headaches, early childhood PTSD, and extreme anxiety. (AR 231.) She testified at the July 2012 administrative hearing that she cannot work because she never knows when her symptoms—including migraines, exhaustion, and anxiety—will be incapacitating. (AR 44–45.) She stated that she does not have the strength to play the piano all the time, and suffers migraines, loses focus, and has anxiety during performances; and then suffers for a day or two after. (AR 46–47, 55–57.) As a result, she performs no more than once or twice monthly. (AR 48.) Carter explained that her impairments affect every aspect of her life, stating: "There's nothing that I do during any day that is not affected [by] the fibro[myalgia], the migraine[s], and the [PTSD]. . . . I'm pretty useless in my own life. [I can only] do regular things . . . like get it together to do laundry . . . ." (AR 61.) Carter further stated that her condition has been at that level since 2001 (*id.*), and that although she had periods of making progress, something would happen and she would "go right back down again" (AR 62). She explained that the periods of making progress never lasted more than "a couple of days or a week." (*Id.*)

Carter's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on July 19, 2012 by Administrative Law Judge ("ALJ") Dory Sutker. (AR 32–91.) Carter appeared and testified, and was represented by an attorney. A vocational expert and a medical expert also testified at the hearing. On August 14, 2012, the ALJ issued a decision finding that Carter had not been disabled under the Social Security Act from her alleged onset date of

June 30, 2005 through her date last insured.  (AR 19–26.)  Thereafter, the Appeals

Council denied Carter's request for review, rendering the ALJ's decision the final

decision of the Commissioner.  (AR 1–5.)  Having exhausted her administrative

remedies, Carter filed the Complaint in this action on March 6, 2014.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to

whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The

claimant is presumptively disabled if his or her impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the

claimant's residual functional capacity ("RFC"), which means the most the claimant can

still do despite his or her mental and physical limitations based on all the relevant

medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the

claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§

404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Sutker first determined that Carter had not engaged in substantial gainful activity since her alleged disability onset date of June 30, 2005.  (AR 21.)  At step two, the ALJ found that, although Carter had the medically determinable impairments of fibromyalgia, migraine headaches, PTSD, and anxiety disorder; none of these impairments, alone or in combination, significantly limited Carter's ability to perform basic work-related activities for 12 consecutive months through the date last insured.  (*Id.*)  Thus, the ALJ determined that Carter had not had a severe impairment or combination of impairments during the relevant period.  (*Id.*)  The ALJ concluded that Carter had not been under a disability "at any time from June 30, 2005, the alleged onset date, through June 30, 2005, the date last insured."  (AR 26.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

 In considering a Commissioner's disability decision, the court "review[s] the

administrative record *de novo* to determine whether there is substantial evidence

supporting the . . . decision and whether the Commissioner applied the correct legal

standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of

the Commissioner's decision is thus limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder.").  "Substantial evidence" is more than

a mere scintilla; it means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the

Social Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Carter disputes the ALJ's step-two finding that Carter had no severe impairment during the alleged disability period. In relevant part, the ALJ found as follows:

> While the record documents the existence of [Carter's] impairments dating back to the 1990s, the record is absent medical evidence indicating that these impairments significantly limited her ability to perform basic work-related activities, such that they were "severe" impairments as defined by the Act *at the time of her alleged disability onset date, June 30, 3005*.

(AR 22 (emphasis added).) There is little dispute that Carter's impairments were severe, i.e., resulted in significant limitations in her ability to do basic work activities, from approximately 1996 through 2001 and then again starting in approximately 2010. The relevant issue, however, is whether these impairments were severe on June 30, 2005, the alleged disability period. After thoroughly reviewing the record, I find that they were not, and that the ALJ's analysis of Carter's claim was legally proper, for the reasons explained below.

## I.      The ALJ did not err in finding that Carter had no severe impairment or combination of impairments during the relevant period.

It is the claimant's burden to show at step two that she had a medically severe impairment or combination of impairments as of the date last insured. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("If the process ends at step two, the burden of proof never shifts to the [Commissioner]. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."); *Vilardi v. Astrue*, 447 F. App'x 271, 272 (2d Cir. 2012) (citing 42 U.S.C. § 423(a)(1)(A); *Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989)) ("[Claimant's]

reliance on evidence demonstrating a worsening of her condition after [the date last insured] is of little value, because she was required to demonstrate that she was disabled as of [that date]."). The regulations define a "severe" impairment as one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010). The Social Security Administration has explained that an impairment or combination of impairments is "not severe" when medical evidence establishes "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on [the claimant's] ability to work even if the [claimant's] age, education, or work experience were specifically considered (i.e., the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." SSR 85-28, 1985 WL 56856, at *3 (1985).

Carter argues that the evidence "far surpasses" the showing required at step two of the ALJ's sequential analysis to demonstrate that she has a severe impairment. (Doc. 5 at 7.) Although, as discussed above, Carter is correct that the step-two severity analysis requires only a minimal showing by the claimant, it is still incumbent on the claimant to make that minimal showing *for the period under review*, i.e., the period from the claimant's alleged disability onset date through the date last insured. *See* 42 U.S.C. § 423(c); 20 C.F.R. §§ 404.130, 404.131, 404.315(a). Here, the evidence does not indicate that Carter had a severe mental or physical impairment on or around June 30, 2005, the alleged disability onset date and date last insured.

### A.    Physical Impairments

As discussed above, the evidence demonstrates that, for well over two years before June 30, 2005, Carter's physical symptoms—including fibromyalgia and migraine headaches—were stable; and she was able to function without significant limitations. (*See, e.g.*, AR 342–43 (May 2005 treatment note stating that Carter had migraines only one to two times monthly, and they were helped by Imitrex; her chronic fatigue/fibromyalgia was improved; and her overall pain level was tolerable); 353 (March 2004 treatment note stating that Carter's fibromyalgia was doing well and her migraines were improving); 360 (January 2003 treatment note stating that Carter used her medications infrequently because she was feeling better with regular exercise); 365 (April 2002 treatment note stating that Carter's fibromyalgia was "well managed"; her migraines were "well controlled [with] Imitrex;" and she was "[d]oing well [with] exercise" and feeling fatigued "likely related to [increased] activity level over past few weeks").)  The ALJ accurately stated that records from this period indicate that Carter's fibromyalgia was well managed; her migraines were well controlled; and her pain level was tolerable.  (AR 22 (citing AR 342–43, 345, 352, 365, 373).)

The only record from the alleged disability period is a June 2005 emergency department note which documents that Carter had a severe migraine headache.  (AR 438–39.)  But that note includes normal examination findings, and indicates that, one and one-half hours after her admission to the emergency department, Carter had "near complete resolution of her symptoms."  (AR 439.)  The ALJ accurately stated that Carter was not seen again for her migraine headaches until February 2006, approximately eight months

after her date last insured.  (AR 23 (citing AR 341).)  And even then, a treatment note

from Dr. Wood states that Carter was "[d]oing well," and that Imitrex was "working

well" for her migraines.  (AR 341.)  At that time, Carter was working on "setting up [a]

demo CD [and a] website."  (*Id*.)  A July 2006 e-mail from Carter to Dr. Wood reflects

that, although she required medication refills due to her overuse of muscle relaxants and

Xanax, she was having an "extremely busy" summer "with all positive things" and was

"working every[ ]day."  (AR 338.)  Carter stated that she had "had no down time

whatsoever" since she had last seen Dr. Wood; she was "really stressed with all the music

business going on"; and she was getting her first break from performing at events "in

about [four] months."  (*Id*.)  Dr. Wood's treatment notes from 2007 and 2008 similarly

document that Carter's headaches and fibromyalgia were under control for the most part

during those years.  (*See, e.g.*, AR 331, 334, 336.)  Although, as discussed earlier, Carter

was seen in the emergency department for another severe migraine headache in February

2007, upon discharge later that day, she was "feeling much better" and her headache was

gone.  (AR 442.)

Given this evidence, the record supports the ALJ's finding that Carter's physical

impairments did not result in more than a minimal impact on her ability to perform basic

work functions on June 30, 2005, the alleged disability onset date.

### B.    Mental Impairments

Similarly, the record supports the ALJ's finding that Carter's mental impairments

did not result in more than a minimal impact on her ability to perform basic work

functions on the alleged disability onset date.  The record reflects that Carter had no

mental health treatment with a psychiatrist or psychologist for several years before and several years after her alleged disability onset date and date last insured of June 30, 2005. She stopped treating with Dr. Bushell in 2002 and did not start up again until 2008.  (AR 407, 479–519.)  In March 2011, Dr. Bushell stated that she could not "speak to [Carter's] current symptom[s]" or disability claim, because she had not seen her in three years.  (AR 407–08.)  The record contains no statement from any mental health provider from around June 2005 which documents Carter's mental impairments around that time. Approximately one year earlier, in May 2004, Dr. Wood stated in a treatment note that, with counseling, Carter felt like she had worked through many of her emotional issues. (AR 347.)  The note further states that Carter was "no longer in counseling and [wa]s not interested in returning to counseling, nor [wa]s she interested in any psychiatric medication."  (*Id.*)  Approximately one month before the alleged disability onset date, in May 2005, Dr. Wood stated in a treatment note that Carter reported that she felt a "hormonal imbalance" was causing a "stress reaction" which brought on her migraine headaches.  (AR 342 (internal quotation marks omitted).)  As noted earlier, Dr. Wood also stated in that treatment note that Carter was having only one or two migraine headaches monthly, and Imitrex was working well to treat them.  (*Id.*)  The Commissioner correctly argues that a "stress reaction" that occurs twice monthly and is effectively treated with medication does not constitute a "severe" impairment which significantly limits a person's ability to do basic work activities.  (Doc. 7 at 17.)  *See* 20 C.F.R. § 404.1520(c).  Moreover, Dr. Wood was not a psychologist or psychiatrist, and she primarily treated Carter's physical, not mental, impairments.

13

The ALJ properly relied on the opinions of psychologist Dr. Ira Hymoff, the testifying medical expert, in finding a lack of evidence to support the existence of a severe mental impairment during the alleged disability period.  (AR 23–24.)  Dr. Hymoff accurately testified that there was a significant gap in mental health treatment between the years 2001 and 2010 (AR 67, 76), and that Carter's principal treatment around the relevant period was by her primary care physician, Dr. Wood, for physical complaints including migraines and fibromyalgia, not mental impairments (AR 72, 84).  Although Dr. Hymoff found that for the years 1996–2001 and 2010 forward, Carter's mental impairments were at a listing level (AR 81–82), he stated that it could not be inferred from that finding that those impairments remained at a listing level for the period under review (AR 83).  He explained that, although it is reasonable to assume that Carter's symptoms persisted in that period, it is unclear whether they remained severe because "we don't have much data on that" (*id.*), and it is difficult to decipher from the three times she received treatment in 2000 what the severity of her symptoms was, as "[the treatment notes] don't specifically say enough about the gravity of the PTSD symptoms" (AR 84).  Dr. Hymoff continued: "[the symptoms] do[] not go away, but there are certain periods of PTSD, functioning at a higher level."  (AR 83.)  Dr. Hymoff emphasized that, "in 2005[,] there was no mental health person [treating Carter]" (AR 84); and opined that, if Carter's level of functioning had been markedly limited during the relevant period, those limitations would have been reflected in the contemporaneous treatment notes, and Carter likely would have been referred to a psychologist (AR 71).

14

Citing to the Second Circuit in *Shaw v. Chater*, Carter argues that the gap in her mental health treatment should not have been used by the ALJ to undermine her disability claim.  (Doc. 10 at 3–5 (citing *Shaw*, 221 F.3d at 133).)  Carter asserts that, "[w]hen a medical condition is chronic and persistent, it is perfectly appropriate to consider evidence before and after the onset date to show continuing treatment and the progress and severity of the condition."  (Doc. 10 at 5.)  In *Shaw*, the Second Circuit held that, "[w]hile it is conceivable that a three-year gap in plaintiff's medical treatment might be part of a more extensive inquiry into whether he was in fact disabled, the fact of this time lapse does not negate the compelling evidence in the record as a whole that plaintiff was completely disabled."  *Shaw*, 221 F.3d at 133.  This case is distinguishable from *Shaw*, however, because, even without considering Carter's failure to seek mental health treatment during the relevant period, the record contains compelling evidence, discussed above, that Carter was not disabled at that time.  *See Campbell v. Astrue*, 596 F. Supp. 2d 446, 454 (D. Conn. 2009).  Therefore, the ALJ cites Carter's failure to seek treatment as one of a number of factors demonstrating that Carter was able to perform basic work functions on the alleged disability onset date.  (*See* AR 23–26.)

At the July 2012 administrative hearing, Carter attempted to explain her substantial gap in mental health treatment from approximately 2003 through 2008 by stating that she "think[s] there was a period of time . . . where [she] didn't have health insurance so [she] was paying out-of-pocket."  (AR 59.)  Later in the hearing, she stated more definitively that she "went years with no health insurance" because she was too sick to work and her husband "was not making enough for us to have health insurance."  (AR

86.)  Carter explained that she was "just kind of managing myself on my own which is why there is that gap."  (*Id.*)  The Second Circuit has consistently held that a disabled claimant cannot be denied benefits for failing to obtain treatment she could not afford. *See Shaw*, 221 F.3d at 133 ("It would fly in the face of the plain purposes of the Social Security Act to deny claimant benefits because he is too poor to obtain additional treatment that had proved unhelpful."); *Campbell*, 596 F. Supp. 2d at 454 ("an ALJ may not draw negative inferences from a claimant's lack of treatment without considering any explanations the claimant may provide").  In this case, however, there is evidence that Carter's failure to seek mental health treatment during the relevant period was not because she could not afford it, but rather because she was doing better and did not require it.

Contrary to Carter's statements discussed above, she also stated at the administrative hearing that she stopped treating with Dr. Bushell in 2003 or 2004 because she thought she was "making progress" (AR 58) and was "mov[ing] forward" (AR 59). She stated: "I started to think I was doing better say in 2007, . . . towards that point where I was doing a little more music."  (AR 88.)  This aligns with Dr. Wood's recording in a May 2004 treatment note that Carter "has attended counseling for some[]time and feels like she has worked through many of her emotional issues and reports that what she has identified as [PTSD] symptoms have decreased significantly."  (AR 347.)  Also contrary to Carter's claim that she did not seek mental health treatment during the alleged disability period because of her lack of health insurance and inability to pay out of pocket, she testified at the administrative hearing that she was working with an herbalist,

and seeing a naturopathic doctor and a chiropractor around the relevant period and that she paid for some of that treatment out of pocket.  (AR 88–90.)  Further, Dr. Wood's May 2004 treatment note confirms that Carter treated with multiple other practitioners around that period, including the naturopathic doctor, a physical therapist, a massage therapist, and a private masseuse.  (AR 347.)

Considering the evidence as a whole, I find that the ALJ did not err in determining that Carter's physical and mental impairments were not severe during the relevant period. Although generally, evidence of the severity of a claimant's impairments during the period before and after the alleged disability period may support a conclusion that these impairments were also disabling *during* the relevant period, here, evidence closer in time to Carter's alleged disability period indicates that Carter's impairments were not in fact severe during that period.

## II.    The ALJ properly analyzed the opinions of the treating medical providers and the non-examining medical expert.

Next, Carter argues that the ALJ erred in her analysis of the opinions of Carter's treating medical providers, Dr. Bushell and Dr. Wood, and in her reliance on the opinions of medical expert Dr. Hymoff.  As explained below, I find no error for the principal reason that the treating provider opinions do not specifically address the relevant period and Dr. Hymoff's testimony is supported by substantial evidence.

In general, a treating physician's opinion is accorded "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial [record] evidence."  20 C.F.R. §

17

404.1527(c)(2).  Nevertheless, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999), as it is the Commissioner who is "responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability," 20 C.F.R. § 404.1527(d)(1).  Moreover, the deference accorded to a treating physician's opinion may be reduced upon consideration of other factors, including the length and nature of the treating doctor's relationship with the patient, the extent to which the medical evidence supports the doctor's opinion, whether the doctor is a specialist, the consistency of the opinion with the rest of the medical record, and any other factors which tend to contradict the opinion.  20 C.F.R. § 404.1527(c)(2)–(6); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.") (citation omitted).

### A.    Dr. Bushell

In January 2012, over six years after the alleged disability period, Dr. Bushell, Carter's treating psychologist, opined that Carter had marked and extreme mental limitations (AR 466–67) and was "fully disabled" (AR 468).  Preliminarily, these 2012 opinions are inconsistent with Dr. Bushell's own March 2011 statements in a letter to Vermont Disability Determination Services that the Doctor could not "speak to [Carter's] current symptom picture" (AR 407) or "disability claim currently" (AR 408), given that

she had not seen Carter in her office in three years.  As the Commissioner states, "it is puzzling" how Dr. Bushell could make opinions about Carter's functioning in 2012 when she stated she could not do so approximately one year earlier, without having seen Carter in the interim.  (Doc. 7 at 20.)  More importantly, although Dr. Bushell stated that Carter "would probably have been considered fully disabled long ago," the Doctor did not specify a particular date or period of disability.  (AR 468.)  And in fact, it would be difficult if not impossible for Dr. Bushell to opine about the specific year of Carter's alleged disability—2005—because she had not seen Carter for approximately two years before and three years after that year, given that Dr. Bushell did not treat Carter from approximately 2003 to 2008.  (AR 407, 480.)  Therefore, the ALJ did not err in affording limited weight to Dr. Bushell's opinions on the grounds that they were "rendered many years after the alleged disability onset date."  (AR 25.)  Nor did the ALJ err in finding that Dr. Bushell's opinions are "not supported by contemporaneous treatment notes" (*id.*), for the reasons discussed above.  *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

### B.    Dr. Wood

In October 2011, Carter's treating primary care provider, Dr. Wood, opined that Carter had limitations in her ability to sit, stand, and walk due to her physical impairments including chronic fatigue and fibromyalgia.  (AR 430–31.)  Dr. Wood specified, however, that those limitations had fluctuated since 2005 and had been present only since March 2010, nearly five years after expiration of Carter's date last insured of

19

June 30, 2005.  (AR 431.)  In a June 2012 opinion, Dr. Wood reiterated that Carter's

symptoms have "waxed and waned . . . over the years."  (AR 552.)  Regarding Carter's

mental impairments, although Dr. Wood opined that Carter was "fully disabled" in

January 2000, the Doctor stated that Carter's condition "gradually improved such that in

2006 she began to develop self[-]employment that would accommodate [her symptoms

including fatigue, muscle pain, and anxiety]."  (AR 429.)  Dr. Wood further stated that

Carter "had a major setback with triggering of PTSD symptoms during surgery in [March

2010,] and [thereafter,] was back to the level of dysfunction in [January] 2000–fully

disabled."  (*Id.*)

Therefore, Dr. Wood essentially opined that Carter's condition was disabling in

January 2000, improved to a point where she was self-employed in 2006, and then

deteriorated again in March 2010, to a point where she was unable to work.  This opinion

in fact supports the ALJ's finding that, although Carter's impairments appear to have

been severe both before and after the alleged disability period (June 30, 2005), they were

not severe *during* that period.  Even assuming Dr. Wood's opinions support Carter's

disability claim for the period under review, the ALJ correctly stated that Dr. Wood's

"own contemporaneous treatment notes" are inconsistent with such claim.  (AR 24.)  As

discussed above, these treatment notes show that Carter's symptoms and ability to

function improved significantly during the alleged disability period.  (*See, e.g.*, AR 342–

43, 353, 360.)  In particular, Dr. Wood's notes indicate that Carter had the ability to work

during the alleged disability period, even if only on a part-time basis and on her own

schedule.  *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not

substantial gainful activity, it may show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claim that he was totally disabled.").

For these reasons, the ALJ did not err in affording only "limited weight" to Dr. Wood's opinions.  (AR 24.)

### C.    Dr. Hynoff

Next, Carter claims that the ALJ erred in affording "substantial weight" (AR 24) to the testimony of the medical expert, Dr. Hymoff.  According to Carter, Dr. Hymoff's testimony was "confused, contradictory, and difficult to understand."  (Doc. 5 at 16.) Carter asserts that, even Dr. Hymoff "testified that Ms. Carter's PTSD and anxiety disorders alone met the Listing 12.06 criteria from 1996 through 2002 and again in 2010."  (*Id.* at 10 (citing AR 69, 81).)  Carter then argues that, because there is no evidence indicating that she improved during the intervening years, it may be inferred that her mental impairments met the Listing 12.06 criteria in 2005 as well.  (*Id.*)  This argument is unpersuasive, given that there is in fact evidence indicating that Carter improved during the intervening years and was not experiencing as severe symptoms as she was before and after the relevant period.  As discussed above, the evidence demonstrates that Carter did not have mental health treatment for well over two years before and several years after her alleged disability onset date; and that the reason for this lack of treatment was because Carter's impairments were not severe during the alleged disability period.  (*See, e.g.*, AR 347.)

**III.    The ALJ did not err in her assessment of Carter's credibility.**

Finally, Carter asserts that the ALJ erred in finding that she was not entirely credible.  The argument fails.  It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted).  If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.  *Id.* (citing *McLaughlin v. Sec'y of Health, Educ. and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).  "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

Here, the ALJ determined that Carter's statements concerning the intensity, persistence, and limiting effects of her symptoms *during the alleged disability period* were not entirely credible for the following primary reason:

> While the record documents the existence of [Carter's] impairments dating back to the 1990s, [it] is absent medical evidence indicating that these impairments significantly limited her ability to perform basic work-related activities, such that they were "severe" impairments . . . *at the time of her alleged disability onset date, June 30, 2005.*

(AR 22 (emphasis added).)  The ALJ further explained that the evidence indicated that Carter's physical symptoms were generally stable and controlled with medication during the relevant period, and her mental symptoms had significantly decreased such that she no longer required mental health treatment during that period.  (AR 23–25.)  As discussed

above, the record supports these findings, and thus I find no error in the ALJ's

assessment of Carter's credibility.

## Conclusion

For these reasons, I recommend that Carter's motion (Doc. 5) be DENIED, the

Commissioner's motion (Doc. 7) be GRANTED, and the decision of the Commissioner

be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 11th day of December, 2014.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after
service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge
and all parties, written objections which shall specifically identify those portions of the
Report and Recommendation to which objection is made and the basis for such
objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).
Failure to timely file such objections "operates as a waiver of any further judicial review
of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15,
16 (2d Cir. 1989).